UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIN COUNTY CHAPTER OF NATIONAL ORGANIZATION FOR WOMEN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MARIN, et al.,<br><br>Defendants. | Case No. 76-cv-01239-RS<br><br>**ORDER GRANTING MOTION TO VACATE CONSENT DECREE** |

## I. INTRODUCTION

On January 28, 1980, this Court entered a Consent Decree between Plaintiff Marin County Chapter of the National Organization of Women ("Marin NOW") and Defendant County of Marin ("the County") aimed at ensuring equal opportunities for women in County employment. Now, over forty years later, the County moves to vacate the Consent Decree under Federal Rule of Civil Procedure 60(b)(5). As discussed in greater detail below, the County has satisfied (and in some areas exceeded) the goals of the Consent Decree, and further enforcement of the Decree would be inequitable. Thus, the motion is granted, and the Consent Decree is vacated.

## II. BACKGROUND

Marin NOW was the Marin County branch of the National Organization of Women, "a non-profit organization, national in scope, dedicated to the eradication of sex discrimination in all areas, including employment." Dkt. 1, at 2. In 1976, Marin NOW filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, alleging the County's policies and

practices discriminated against women on the basis of sex. After four years of motion practice, on January 28, 1980, the parties agreed to, and the Court entered, a Consent Decree that remains in effect. Dkt. 154 ("Decree").

The Decree enjoins the County from discriminating against any individual on the basis of sex, specifically regarding employment opportunities. It also requires the County to establish a quota system for hiring, with the goal of ensuring "that the percentage of females employed in each [job] category or position shall reflect the supply of females in the relevant labor market for such category." *Id.* at 3. The Decree also requires the County to (among other things) establish and maintain an intensive affirmative action program aimed at recruiting women, ensure that minimum qualifications and job postings reflect the skills required, provide career ladders to help women advance, and eliminate pay discrepancies between classifications with similar job descriptions. *Id.* at 3–7. Marin NOW retained the right to seek court relief if it determined that the County was "not meeting the goals and objectives set forth in [the] Decree." *Id.* at 8.

In the decades since it was entered, activity involving the Decree has been minimal. The County has submitted thirty-six semiannual reports to the Court regarding its compliance with the Decree. *See* Dkt. 194. There is no record that Marin NOW has sought court relief for the County's noncompliance. *See id.* The last filing in the case, prior to 2022, was in April 1999. While the Decree states that "[t]he Court shall retain jurisdiction in this action until such time as the parties jointly file a statement with the Court that all conditions contained in the Consent Decree have been fully and completely complied with," *id.* at 8–9, this no longer appears possible: according to the National Organization of Women, it has no record of a current Marin County chapter and "presumes that the chapter no longer was active or viable after 2006." Dkt. 195-2 ¶ 2. The County now seeks to vacate the Consent Decree on the grounds that it has satisfied the requirements of the Decree and that prospective application of the Decree is inequitable.[1]

---

[1] In place of Marin NOW, the Court invited organizations to submit amicus briefs; one was received from a member of the public.

ORDER GRANTING MOTION TO VACATE CONSENT DECREE
CASE NO. 76-cv-01239-RS

2

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 60(b)(5) contemplates three independent circumstances in which a party may obtain relief from a court order: (1) "the judgment has been satisfied, released, or discharged"; (2) "it is based on an earlier judgment that has been reversed or vacated"; or (3) "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The County asserts the first and third bases as grounds for relief from the Consent Decree.

#### A. Satisfaction of Consent Decree

Under the first basis for relief, the moving party must show that the decree has been "satisfied, released, or discharged." Fed. R. Civ. P. 60(b)(5). This can be established with a showing that the moving party "substantially complied" with the decree's requirements. *Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011). Substantial compliance "is not susceptible of a mathematically precise definition," but it implies "something less than a strict and literal compliance with the contract provisions." *Id.* at 284. Any deviations should be "unintentional and so minor or trivial as not 'substantially to defeat the object which the parties intend to accomplish.'" *Id.* (quoting *Wells Benz, Inc. v. United States*, 333 F.2d 89, 92 (9th Cir. 1964)). "The status of compliance in light of the governing standards require overall attention to whether the larger purposes of the decrees have been served." *Id.* at 288. Thus, in considering the performance of a decree's specific terms, a court "must also consider the more general goals of the decree which the terms were designed to accomplish." *Id.* (quoting *Youngblood v. Dalzell*, 925 F.2d 954, 960 (6th Cir. 1991)).

#### B. Prospective Application of Consent Decree

As another, independent basis for relief, a judgment may be vacated where prospective application of a decree is inequitable. *See* Fed. R. Civ. P. 60(b)(5). To obtain relief under this basis, the moving party "bears the burden of establishing that a significant change in circumstances," either factual or legal, "warrants revision of the decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383–84 (1992). When changed circumstances make compliance with the decree "more onerous, unworkable, or detrimental to the public interest," vacatur is

1  warranted. *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (internal quotation
2  marks and citation omitted). The mere inconvenience of living with the terms of a consent decree
3  is not enough. *See Rufo*, 502 U.S. at 383. Once the moving party carries its burden, "a court
4  abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such
5  changes.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Agostini v. Felton*, 521 U.S. 203,
6  215 (1997)).

7  Courts must take a "flexible approach" to Rule 60(b)(5) motions addressing "institutional
8  reform decrees," or consent decrees designed to reform a public institution. *Id.* at 450 (citing *Rufo*,
9  502 U.S. at 381). This ensures that "'responsibility for discharging the State's obligations is
10  returned promptly to the State and its officials' when the circumstances warrant." *Id.* (quoting
11  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004)). A flexible standard serves the public
12  interest "because such decrees 'reach beyond the parties involved directly in the suit and impact
13  on the public's right to the sound and efficient operation of its institutions.'" *Rufo*, 502 U.S. at 381
14  (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)).

15  This flexible approach to institutional reform decrees is warranted for three reasons. First,
16  institutional reform decrees "often remain in force for many years, and the passage of time
17  frequently brings about changed circumstances — changes in the nature of the underlying
18  problem, changes in governing law or its interpretation by the courts, and new policy insights —
19  that warrant reexamination of the original judgment." *Horne*, 557 U.S. at 447–48. Second,
20  institutional reform cases "often raise sensitive federalism concerns," because such litigation
21  "commonly involves areas of core state responsibility." *Id.* at 448. Third, the dynamics of such
22  litigation differ from the dynamics of other cases. "[P]ublic officials sometimes consent to, or
23  refrain from vigorously opposing, decrees that go well beyond what is required by federal law."
24  *Id.* As a result, they become bound to the policy preferences of their predecessors and may be
25  "improperly deprive[d] . . . of their designated legislative and executive powers." *Id.* at 449
26  (quoting *Frew*, 540 U.S. at 441).

27  This approach to institutional reform litigation "seeks to return control to state and local

28  ORDER GRANTING MOTION TO VACATE CONSENT DECREE
CASE NO. 76-cv-01239-RS

4

1    officials as soon as a violation of federal law has been remedied." *Id.* at 450–51. "If a durable
2    remedy has been implemented, continued enforcement of the order is not only unnecessary, but
3    improper." *Id.* at 450 (citing *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)). "[A]t a minimum, a
4    'durable' remedy means a remedy that gives the Court confidence that defendants will not resume
5    their violations of plaintiffs' [rights under federal law] once judicial oversight ends." *Evans v.
6    Fenty*, 701 F. Supp. 2d 126, 171 (D.D.C. 2010). "[F]leeting federal compliance is insufficient to
7    warrant relief." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1202 (10th Cir. 2018).
8    "Thus, a district court, in assessing whether further oversight is equitable, may and should
9    consider the totality of defendants' efforts to comply with federal law and defendants'
10   commitment to remaining in compliance with federal law." *Id.* at 1202–03; *see also Consumer
11   Advisory Bd. v. Harvey*, No. 2:91-CV-00321-GZS, 2009 WL 5792159, at *11 (D. Me. Oct. 9,
12   2009) (suggesting that a "durable remedy" is equivalent to having in place "a mechanism for
13   future compliance").

## IV. DISCUSSION

The County moves to vacate the Consent Decree under the first and third bases of Rule 60(b)(5). Both have been satisfied, and each is discussed in turn.

### A. The Consent Decree Has Been Satisfied

First, the County argues it has substantially complied with the Consent Decree, as to both the narrower goal of numerical equity through quotas, and the "larger purposes" of inclusion and opportunity — that is, promoting equal employment opportunities between men and women. The evidence the County offers is thorough and compelling.

With respect to numerical equality, the County has provided data demonstrating that, over the last five years, approximately 56% of County employees have been female. *See* Dkt. 195-8 ¶ 2; Dkt. 195-9, Ex. A. The County has exceeded the quotas for women in all but two job classifications — and in those two, it was only slightly deficient. *See* Dkt. 195-8 ¶ 3; Dkt. 195-10, Ex. B. Though the County has not achieved literal compliance with the quotas, the deviations are minor and do not substantially defeat the essential purpose of the Decree.

1    The County has also substantially met the additional requirements designed to achieve the Consent Decree's larger objective. For example, the Decree requires the County to establish and maintain "an intensive affirmative action recruitment program" aimed at recruiting more women. Decree, at 4. The County met this requirement by establishing and maintaining an Equal Employment Opportunity Program that requires the County to (1) "work with County Departments and non-profits to develop opportunities" for women in County employment; (2) "provide cultural intelligence training to all employees"; (3) "use diverse hiring panels to help eliminate . . . potential bias"; (4) "continue to review and revise minimum qualifications for job classifications to increase job opportunities in underutilized job classes"; and (5) "continue to interview at least one women [sic] and at least one person of color for all upper management job recruitments." *See* Dkt. 195-17, Ex. I at 64. The County has also maintained an Affirmative Action Officer, developed career ladders for employees, and eliminated pay discrepancies between job classifications with similar job descriptions, all of which are required by the Decree. *See* Decree, at 3–6; Dkt. 195-8 ¶ 6; Dkt. 195-20, Ex. L. It has met the other enumerated requirements as well. *See* Decree, at 4–7; Dkt. 195-8 ¶ 18; Dkt. 195-15, Ex. G at 13; Dkt. 195-16, Ex. H at 5; Dkt. 195-17, Ex. I at 65; Dkt. 195-18, Ex. J.

The County has thus substantially (and thoroughly) complied with both the specific terms and the general goals of the Decree to promote equal employment opportunities for women in Marin County. Vacatur is therefore warranted under this basis of Rule 60(b)(5).

**B. Prospective Application of the Consent Decree Would Be Inequitable**

Second, and just as importantly, significant changes render continued enforcement of the Decree inequitable, detrimental to the public interest, and unworkable. Additionally, given the heightened federalism concerns inherent to institutional reform decrees such as the one at issue here, vacatur is appropriate. As there is no apparent ongoing violation of federal law, and durable remedies exist to address any future violations, responsibility should be returned to the County to continue implementing its own policies to address and foster equal opportunity in County employment.

While the fundamental purpose of the Decree is to increase employment opportunities for women in the County, the Decree largely seeks to do so by requiring quotas for women in different job classifications. Since entry of the Decree, changes in federal and state law make such quotas legally suspect. First, the 1991 amendments to Title VII prohibit consideration of sex as a factor in an employment decision. Specifically, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). Further, in 1996, California voters passed Proposition 209, a state constitutional amendment that, in relevant part, prohibits the State from "discriminat[ing] against, or grant[ing] preferential treatment to, any individual or group" on the basis of sex in the operation of public employment. CAL. CONST. art. I, § 31(a). The Consent Decree's required quotas determine that women will preferentially be granted a certain percentage of positions based on their sex. Regardless of the particular legal viability of these quotas,[2] the Decree is certainly in serious tension with federal and state law, such that continued enforcement would be detrimental to the public interest.

This is not the Decree's only flaw. Parts of the Decree are internally inconsistent with each other: for instance, the Decree enjoins the County from discriminating against *any individual* because of sex, while simultaneously relying on quotas that (as noted above) arguably require discrimination on the basis of sex. Further, the fact that Marin NOW no longer appears to exist, and no successor organization has taken its place, makes maintenance of the Decree unworkable under its own terms.

Additionally, where federalism concerns are heightened, whether there are any ongoing

---

[2] Though Title VII prohibits discrimination on the basis of sex, it does not bar employment decisions made pursuant to valid affirmative action policies. *See Hannon v. Chater*, 887 F. Supp. 1303, 1315 (N.D. Cal. 1995) (citing *Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 626 (1987). Whether the Decree constitutes a "valid affirmative action policy" need not be addressed, but *Johnson* appears to suggest that quotas, especially where not temporary in nature, would not constitute part of a valid affirmative action policy. 480 U.S. at 622, 626, 630, 637–41.

violations of federal law must be considered. None appear to exist here. The parties agreed to the Consent Decree without the County making an admission of liability under Title VII and without the Court making any findings or conclusions on this point. Although Marin NOW retained the right to seek court relief for the County's noncompliance, in the four decades since the Decree's entry, there is no record that Marin NOW (nor any other party) sought to do so.

Even without a finding of a violation of Title VII, the County has implemented durable remedies for the alleged violations. The County has established an Equal Employment Advisory Committee, responsible for continuous monitoring of the County's Equal Employment Opportunity programs, as well as a committee to address equal employment issues. *See* Dkt. 195-8 ¶ 7. It has empowered the Marin Women's Commission to monitor the County's hiring processes, study problems, and counsel residents and officials concerning matters related to discrimination against women. *See id.* ¶ 3. It has adopted various plans, programs, and policies aimed at prohibiting discrimination and promoting diversity. *See, e.g.*, Dkt. 195-12, Ex. D; Dkt. 195-13, Ex. E; Dkt. 195-14, Ex. F; Dkt. 195-15, Ex. G; Dkt. 195-16, Ex. H; Dkt. 195-17, Ex. I. The County's current Equal Employment Opportunity policy, which prohibits discrimination, harassment, or retaliation upon any protected class, provides a detailed process by which employees may file complaints, and it requires supervisors to take all necessary steps to promote equal opportunity in employment. *See* Dkt. 195-8 ¶ 8; Dkt. 195-12, Ex. D. The County's "2 Year Action Plan 2021-2023" aims to eliminate employment barriers in hiring and retention for people from historically disadvantaged groups by "modifying internal promotional outreach and selection processes, revising the probationary release process, and modifying the performance evaluation process." Dkt. 195-8 ¶ 12; *see* Dkt. 195-16, Ex. H at 5. The County has implemented mandatory training on equal opportunity and employees' rights in the workplace. *See* Dkt. 195-8 ¶ 15. The list goes on.

Finally, federal and state law provide remedies outside those implemented by the County and which did not exist when the Decree was entered. The 1991 amendments to the Civil Rights Act made new remedies, such as compensatory and punitive damages, available under Title VII to plaintiffs who prove intentional discrimination. *See* 42 U.S.C. § 1981a. Since 2016, California law

has required employers (including public employers) to adopt detailed policies for reporting harassment and discrimination. *See* CAL. CODE REGS. tit. 2, § 11023(b). The County is also required, as of 2020, to submit annual pay data reports — including the number of employees by sex, race, and ethnicity in different job categories, along with total earnings and hours worked — to the California Department of Fair Employment and Housing. *See* CAL. GOV'T CODE § 12999.

Taken together, these changes at the federal, state, and local level indicate that prospective application of the Decree would be inequitable. The County's policies aimed at remedying sex discrimination are significant and multifaceted, going far beyond "fleeting federal compliance" and providing confidence that the County will not resume the alleged violations complained of. Given that the Decree has been in place for over forty years, and bearing in mind the additional concerns attendant to institutional reform decrees, responsibility should be returned to the County and its officials who can best serve the public interest.

## V. CONCLUSION

The County has demonstrated that vacating the Consent Decree is warranted under two independent bases of Rule 60(b)(5). The motion is therefore granted, the Consent Decree is hereby vacated, and the case will be closed.

However, it is worth clarifying what this decision means — and what it does not. It is not meant to suggest that the County has performed perfectly or that it has conclusively solved the problem of employment discrimination against women. While the County's efforts are laudable, there may well be areas where it has come up short or where further work is needed to ensure equal treatment and opportunities in the workplace. Vacating the Consent Decree indicates simply that the County has fulfilled the Decree's requirements, and that the Decree is no longer the proper vehicle to address its ultimate objectives. The federal courts, as ever, stand ready to receive cases averring discrimination on the basis of sex, and to provide all remedies available under the law.

**IT IS SO ORDERED**.

Dated: February 17, 2023

_____
RICHARD SEEBORG
Chief United States District Judge